Richard D. Monkman
Alaska Bar No. 8011101
rdm@sonosky.net
Sonosky, Chambers, Sachse,
    Miller & Monkman, LLP
302 Gold Street, Suite 201
Juneau, Alaska 99801
Telephone:     907.586.5880
Facsimile:     907.586.5883

Robert P. Lynch
Alaska Bar No. 1305020
rplynch@anthc.org
Senior Legal Counsel
Alaska Native Tribe Health Consortium
4000 Ambassador Drive,
Anchorage, Alaska 99503
Telephone:     907.729.8218
Facsimile:     907.729.2005

Counsel for Alaska Native Tribal Health
  Consortium

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOAN WILSON and PAUL FRANKE, M.D., ) ) ) | |
| Plaintiffs, ) | Case No. 3:16-cv-00195-TMB |
| ) ) | |
| v. ) ) | **MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY** |
| ALASKA NATIVE TRIBAL HEALTH CONSORTIUM, ) ) ) | |
| Defendant. ) ) | |

# TABLE OF CONTENTS

I.      Introduction. ........................................................................................ 3

II.     Factual Background ............................................................................ 4

    A.   Wilson's representation of ANTHC at Sonosky Chambers. .................... 5

    B.   Wilson's representation of ANTHC at ANTHC. ..................................... 5

    C.   Wilson's misappropriation of two ANTHC laptops. ............................... 6

    D.   Wilson's filing of this lawsuit against ANTHC. ..................................... 7

    E.   Wilson's disclosure of ANTHC's confidential information. ................... 7

III.    ARGUMENT ...................................................................................... 7

    A.   Wilson violated ARPC 1.9(a) by filing a *qui tam* lawsuit substantially related to her former representation of ANTHC. ............................................................ 7

       1.   The ARPC 1.9(a) test is "substantial relationship." ........................... 8

       2.   Wilson represented ANTHC as outside counsel on a substantially related matter. ...................................................................................... 11

       3.   Wilson represented ANTHC on substantially related matters as an employed lawyer. ............................................................................... 18

    B.   Wilson violated ARPC 1.9(c) by using and disclosing ANTHC's confidences and secrets. ............................................................................... 22

    C.   Wilson's misappropriation abused the judicial process. ......................... 25

    IV.   CONCLUSION: Wilson, Franke and Dillon & Findley must be disqualified. ...... 29

# I.    INTRODUCTION.

Loyalty and confidentiality are a lawyer's paramount duties to her client.    Under the Alaska Rules of Professional Conduct,

> [a]n attorney "may not represent a third party against a former client where there exists a substantial possibility that knowledge gained by him in the earlier professional relationship can be used against the former client, or where the subject matter of his present undertaking has a substantial relationship to that of the prior representation."[1]

Plaintiff Joan M. Wilson breached the duties owed to her former client, defendant Alaska Native Tribal Health Consortium (ANTHC), when she filed the initial *qui tam* complaint in this matter.  Wilson's confused allegations of fraud and false claims, ANTHC contends, are misleading and unfounded.  Indeed, the Department of Justice investigated her allegations for eighteen months and declined to prosecute the matter.[2]

But the facts remain that Wilson used ANTHC's confidential client information when raising these claims, and that she represented a third party—the United States—against her former client, to benefit her own personal financial interests.[3]  Wilson also improperly used and revealed

---

[1] *Moore v. Olson*, 351 P.3d 1066, 1072 (Alaska 2015) (quoting *Griffith v. Taylor*, 937 P.2d 297, 301 (Alaska 1997)).  *See also* Alaska Rule of Professional Conduct 1.9(a), *Alaska Rules of Court, 2017-18 Main Edition* (Tower Publ. 2017) ("ARPC") at 934; *Aleut Corp. v. McGarvey*, 573 P.2d 473, 474-75 (Alaska 1978); *Burrell v. Disciplinary Bd. of Alaska Bar Ass'n*, 702 P.2d 240, 242 (Alaska 1985) ("[A]n attorney may not represent a third party against a former client where there exists a substantial possibility that knowledge gained by the attorney in the former professional relationship could be used against the former client, or where the subject matter of the present undertaking has a substantial relationship to the prior representation.").

[2] Dkt. 12, *Government's Notice of Election to Decline Intervention,* Dec. 6, 2017.

[3] *See Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*, 809 F.Supp. 1383, 1387 (N.D. Cal. 1992) ("[A]n attorney is forbidden to do either of two things after severing his relationship with a former client. He may not do anything which will injuriously affect his former client in any manner in which he formerly represented him, nor may he at any time use against his former client knowledge or information acquired by virtue of the previous relationship.") (*citing People ex. rel. Deukmejian v. Brown*, 624 P.2d 1206, 1208 (Calif. 1981)).

ANTHC's client confidences and secrets for her own personal gain. Not only that, Wilson took two ANTHC laptops containing confidential documents that she used to file her *qui tam* lawsuit. In so doing, Wilson has become one of only a "handful of lawyers [who] have sued their former clients as *qui tam* relators under the FCA, although to date none have been successful."[4] As one might expect, each court that has ruled on a disqualification motion in those cases has dismissed the case because of the lawyer's ethical violations.[5] The remedy here also is dismissal with prejudice and disqualification of plaintiffs and plaintiffs' counsel.

## II. FACTUAL BACKGROUND

Joan M. Wilson is an experienced lawyer and subject to the Alaska Rules of Professional Conduct. She was admitted to the Alaska Bar Association in 1996. Wilson has worked as a State of Alaska Assistant District Attorney and Assistant Attorney General, and as an associate attorney for two different Anchorage law firms, Davis Wright Tremaine and Sonosky Chambers ("the Sonosky firm"). Wilson was employed at the Sonosky firm from 2010 to 2014, when she left to become ANTHC's Chief Ethics and Compliance Officer. In May 2016 Wilson's ANTHC employment was terminated. She now, again, an Assistant Attorney General.[6]

---

[4] Kathleen Clark & Nancy J. Moore, *Financial Rewards for Whistleblowing Lawyers*, 56 B.C. L. Rev. 1697, 1699 (2015). *See also id.* at 1705 ("Of the nearly ten-thousand *qui tam* FCA cases filed since 1986," only "five cases [were identified] in which a lawyer-relator sued a former client.").
[5] *Id.* at 1705-06 (citing *United States ex rel. Fair Lab. Practices Assocs. v. Quest Diagnostics, Inc.*, 734 F.3d 154 (2d Cir. 2013); *United States ex rel. Doe v. X Corp.*, 862 F. Supp. 1502 (E.D. Va. 1994); *Bury v. Cmty. Hosps. of Cent. Cal.*, No. F036667, 2002 WL 968833 (Cal. Ct. App. May 8, 2002)).
[6] Alaska Directory of Attorneys (Spring 2018), at 130. Wilson's Alaska Bar number is 9611069.

## A. Wilson's representation of ANTHC at Sonosky Chambers.

Wilson was employed at the Sonosky firm from November 2010 until September 2014. During that period, Wilson represented ANTHC as outside counsel. In that capacity, she received confidential information from ANTHC and provided legal advice to ANTHC based on that confidential information, including a matter that is central to her complaints in this action ("the pharmacy matter," discussed below).[7]

## B. Wilson's representation of ANTHC at ANTHC.

In September 2014, Wilson went directly from the Sonosky firm to ANTHC, where she was hired as ANTHC's Chief Ethics and Compliance Officer. Wilson was hired for that position because she is a lawyer and because of the knowledge and expertise she had developed on billing and privacy matters while working as ANTHC's outside counsel at the Sonosky firm. Wilson continued working on many of the same legal issues that she worked on at the firm, including the pharmacy matter.[8]

At ANTHC, Wilson continued to act as a lawyer. Throughout her tenure, Wilson was "engaged in the active practice of law" and was "responsible for ANTHC compliance with all applicable law."[9] At ANTHC, Wilson investigated legal issues, analyzed statutes, regulations and policies, held herself out as a lawyer ("Joan M. Wilson, J.D.") and freely gave legal upon which ANTHC relied.[10]

---

[7] Affidavit of Kay E. M. Gouwens (Gouwens Aff. ¶¶ 4 – 10).
[8] Affidavit of Nacole D. Heslep (Heslep Aff.) ¶¶ 3 – 10)
[9] Ex. A, Alaska Judicial Council, *Application for Judicial Appointment*, Aug. 22, 2016, at 1, 6, 14 ("Over my twenty years as an attorney, I have worked in public and private practice. I have served inhouse as a chief ethics and compliance officer") and 16 ("During my twenty years of practice, I have worked as a civil litigator in public and private practice, as a prosecutor, and a chief ethics and compliance officer.").
[10] Heslep Aff. ¶¶ 11 – 14.

**C.     Wilson's misappropriation of two ANTHC laptops.**

Wilson's ANTHC employment ended on May 6, 2016.  Wilson took and failed to return two ANTHC laptop computers containing confidential ANTHC documents and other information. After three weeks had gone by and Wilson had yet to return the laptops, ANTHC's outside counsel wrote Wilson a letter demanding the return of the laptops by noon the next day.  Wilson responded by agreeing to turn over one of the computers to a courier.  But as to the second computer, Wilson stated, "I believe the appropriate recipient for it is the Department of Justice."  When the courier arrived at Wilson's home, Wilson turned over only the first laptop.  On June 6, 2016, Wilson misinformed ANTHC's counsel that she did not have the second laptop because she had turned it over to "a federal agency."  She would not disclose the agency.[11]

In fact, Wilson did have the second laptop.  ANTHC later learned that on June 7, 2016, a State of Alaska District Court judge signed a search warrant authorizing the State's Medicaid agency to seize the missing laptop from Wilson, based on an affidavit from Wilson.[12]  Wilson has since admitted that she gave that laptop to the State and shared the documents and information on that laptop with both the Department of Justice and the State.[13]

---

[11] Heslep Aff., ¶¶ 18 – 19.
[12] *Id.*, ¶ 21.
[13] Affidavit of Karin Gustafson (Gustafson Aff.) Ex. D, Dillon & Findley letter, January 29, 2018 ("You are correct that our clients provided information to the Department of Justice ("DOJ") and to the State of Alaska.  The State's Medicaid Fraud Control Unit imaged Ms. Wilson's laptop… Ms. Wilson maintained some of the non-privileged documents that supported her retaliation and wrongful termination claims, and also retained some documentation that supports the other claims in the Complaint.  Enclosed is a thumb drive that contains Bates numbered documents provided to the DOJ….").

**D.** **Wilson's filing of this lawsuit against ANTHC.**

On August 29, 2016, Wilson and Paul Franke, through Dillon & Findley, P.C., filed the *qui tam* complaint against ANTHC, under seal. ANTHC became aware of the lawsuit on January 19, 2018, when plaintiffs' attorneys violated the *qui tam* seal and sent ANTHC's counsel a copy of the still-under-seal complaint along with a $1.35 million demand. With a quick settlement, they suggested, "the allegations [of the *qui tam* complaint] will not be litigated in public, thus saving ANTHC from additional bad press and public scrutiny."[14]

**E.** **Wilson's disclosure of ANTHC's confidential information.**

Wilson's counsel subsequently provided a thumb drive containing thousands of documents and computer files that Wilson took from ANTHC and turned over to the Department of Justice when she filed the *qui tam* complaint.[15] These include commercially confidential information, protected patient health information, and documents protected by the attorney-client privilege and work product rule.[16] In addition, Wilson maintains possession of additional "documents that supported her retaliation and wrongful termination claims, and also retained some documentation that supports the other claims in the Complaint."[17]

### III. ARGUMENT

**A.** **Wilson violated ARPC 1.9(a) by filing a *qui tam* lawsuit substantially related to her former representation of ANTHC.**

Alaska Rule of Professional Conduct 1.9(a) provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related

---

[14] Gustafson Aff. Ex. C, Dillon & Findley letter, Jan. 19, 2018 (redacted).
[15] Gustafson Aff. Ex. D.
[16] Heslep Aff. ¶ 21; Affidavit of Martina Ruhle (Ruhle Aff.) ¶¶ 2 – 4..
[17] Gustafson Aff. Ex. D.

matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing. [18]

### 1. The ARPC 1.9(a) test is "substantial relationship."

The Ninth Circuit holds that two matters are "substantially related" for purposes of a lawyer's duty of loyalty and require disqualification if "the factual contexts of the two representations are similar or related":

> The relevant test for disqualification is whether the former representation is 'substantially related' to the current representation. The interest to be preserved by preventing attorneys from accepting representation adverse to a former client is the protection and enhancement of the professional relationship in all its dimensions. It is necessary to preserve the value attached to the relationship both by the attorney and by the client. These objectives require a rule that prevents attorneys from accepting representation adverse to a former client if the later case bears a substantial connection to the earlier one. Substantiality is present if the factual contexts of the two representations are similar or related.[19]

A factual relationship between the two matters is enough for disqualification. No proof that confidences were disclosed is required to enforce the lawyer's "duty of absolute fidelity"[20] to her former client:

> [T]he underlying concern is the possibility, or the appearance of the possibility, that the attorney may have received confidential information during the prior representation that would be relevant to the subsequent

---

[18] Alaska's professional conduct rules apply to this matter because federal courts apply State law in matters of attorney disqualification. *In re Cty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000) ("[Federal courts] apply state law in determining matters of attorney disqualification."). And as set out in the Local Rules, counsel must "at all times conform to the codes and rules of ethics and professional responsibility as may be adopted from time to time by the Alaska Supreme Court." D.Ak. L.R. 39.5(a). *See also* D.Ak. L.R. 83.1(i)(1); *Doyon Drilling, Inc. v. Loadmaster Eng'g, Inc.*, No. 3:10-CV-0094-HRH, 2011 WL 13237589, at *2 (D. Alaska Apr. 29, 2011) ("This court requires attorneys appearing before it to comply with the Alaska Rules of Professional Conduct.").
[19] *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980) (citations omitted).
[20] *Achter v. Weyerhauser Co.*, No. C 95-20082 RMW(PVT), 1995 WL 302406, at *2 (N.D. Cal. May 15, 1995).

matter in which disqualification is sought. The test does not require the former client to show that actual confidences were disclosed. That inquiry would be improper as requiring the very disclosure the rule is intended to protect. The inquiry is for this reason restricted to the scope of the representation engaged in by the attorney.[21]

The Alaska Supreme Court uses a somewhat broader test. If "[1] there exists a substantial possibility that knowledge gained by [the lawyer] in the earlier professional relationship can be used against the former client, or [2] where the subject matter of his present undertaking has a substantial relationship to that of his prior representation," the lawyer is disqualified.[22] Either the "substantial possibility" that knowledge gained in the representation may be used against a former client or the "substantial relationship to the prior representation" justify disqualification.[23] The duty of loyalty not only applies in situations involving representation of parties with materially adverse interests to a former client, but also applies when a lawyer attempts to benefit personally to the detriment of a former client.[24]

---

[21] *U.S. for Use and Benefit of Lord Elec. Co., Inc. v. Titan Pac. Const. Corp.*, 637 F.Supp. 1556, 1561 (W.D. Wash. 1986) (quoting *Trone*, 621 F.2d at 999).

[22] *Aleut Corp.*, 573 P.2d at 474-75 (emphasis and numbers in brackets added). *Accord Chugach Elec. Ass'n v. U. S. Dist. Court for Dist. of Alaska at Anchorage*, 370 F.2d 441, 442-43 (9th Cir. 1966) ("A likelihood here exists which cannot be disregarded that Mr. Boyko's knowledge of private matters gained in confidence would provide him with greater insight and understanding of the significance of subsequent events in an antitrust context and offer a promising source of discovery."); *Trone*, 621 F.2d at 998.

[23] *Richard B. v. State, Dept. of Health & Soc. Servs., Div. of Family & Youth Servs.*, 71 P.3d 811, 818 (Alaska 2003) ("A lawyer's duty to former clients is codified in Alaska Rule of Professional Conduct 1.9(a). Where the previous representation and current litigation cover the same or substantially related matters and the current client's interests are materially adverse to those of the former client, the lawyer shall not represent the current client unless the former client consents."); *Trone*, 621 F.2d at 998; *In re Muscle Improvement, Inc.*, 437 B.R. 389, 394 (Bankr. C.D. Cal. 2010).

[24] *Moore*, 351 P.3d at 1072 ("We have held that 'an attorney "may not represent a third party against a former client where there exists a substantial possibility that knowledge gained by him in the earlier professional relationship can be used against the former client, or where the subject matter of his present undertaking has a substantial relationship to that of the prior representation."'" (quoting *Griffith*, 937 P.2d at 301; *Damron v. Herzog*, 67 F.3d 211, 215 (9th Cir. 1995) ("Because

Importantly, the duty of loyalty applies to an attorney relator in a False Claims Act *qui tam* capacity against a former client.[25] The duty of loyalty is violated whenever a lawyer takes any action in a subsequent matter that may injuriously affect a former client she previously represented in a related matter, or when the lawyer uses "knowledge gained by [the lawyer] in the earlier professional relationship" against the client.[26] If the lawyer's *qui tam* representation of the Government amounts to "a changing of sides," the lawyer has violated her Rule 1.9(a) duty of loyalty to her former client.[27] "Nothing in the False Claims Act evinces a clear legislative intent to preempt state statutes and rules that regulate a lawyer's disclosure of client confidences. . . . . '[W]hile the [FCA] *permits* any person . . . to bring a *qui tam* suit, it does not authorize that person to violate state laws in the process.'"[28]

---

this position creates such a grave risk of breach of confidence, it is anomalous to find that the duty of confidentiality does not have as its direct correlation a duty of loyalty. Therefore, because the duty of confidentiality remains intact with respect to Herzog's representation of Damron, the duty of loyalty also continues with respect to those matters substantially related to that representation.").

[25] *See Quest Diagnostics Inc.*, 734 F.3d at 168; see also *United States ex rel. Doe,* 862 F.Supp. at 1507 (disqualifying attorney/relator); James J. Hennelly, *Attorneys as Qui Tam Relators: How State Ethics Rules Trump the False Claims Act*, Health Law and Policy Brief at 137 (Oct. 9, 2013); *In re Examination of Privilege Claims*, No. MC15-0015-JCC-JPD, 2016 WL 11431678, at *1 (W.D. Wash. 2016) (affirming disqualification of former in-house attorney as a FCA relator: "Judge Donohue correctly concluded DeFond impermissibly switched sides by previously representing Avanade and now representing the United States."); *cf. U.S. ex rel. Holmes v. Northrup Grumman Corp.*, 642 Fed.Appx 373, 376-77 (5th Cir. 2016) (disqualifying attorney/relator: "Holmes violated his duty of loyalty by taking a position in the qui tam suit that was contrary to the interests of his client").

[26] *Matter of Estate of Adkins*, 874 P.2d 271, 273 (Alaska 1994) (citing *Aleut Corp.*, 573 P.2d at 475).

[27] ARPC 1.9 cmt.

[28] *Quest Diagnostics*, 734 F.3d at 163 (emphasis original; citations omitted) (quoting *United States ex rel. Doe*, 862 F.Supp. at 1507).

## 2. Wilson represented ANTHC as outside counsel on a substantially related matter.

As noted above, while at the Sonosky firm Wilson represented ANTHC on the pharmacy matter, a significant legal project concerning Medicaid payments for oncology infusions and other high-priced medications.[29] The pharmacy matter was the first claim in Wilson's *qui tam* complaint and remains the centerpiece in all of Wilson's subsequent amended and proposed amended complaints. All four versions of the complaints target the pharmacy matter:

> ANTHC is in violation of the Alaska Tribal Billing Manual for Medicaid Services, which prevents ANMC from billing for pharmaceuticals dispensed incident to an outpatient visit. Specifically, ANMC bills through its Pharmacy Medicaid Enrollment Number for infusion drugs dispensed during an outpatient visit. In a form of double billing, ANTHC also includes the expense of these drugs in the cost reports used to calculate the IHS encounter rate for outpatient visits. . . . . As a result, ANTHC and ANMC have received overpayments that total at least $50 million.[30]

Wilson's representation of ANTHC on the pharmacy matter while at the Sonosky firm was not brief or in passing; rather, she represented ANTHC on this issue "extensively" for more than a year. Wilson continued working on the pharmacy matter after she left Sonosky to become ANTHC's Chief Ethics and Compliance Officer.[31] Wilson's *qui tam* complaint in this matter "clearly and unmistakably" describes the pharmacy matter.[32] As a lawyer for ANTHC, first at the

---

[29] *See*, Affidavits of Kay E. Maassen Gouwens and Nacole D. Heslep.

[30] *False Claims Act Complaint and Demand for Jury Trial*, Dkt. 1, at 9, ¶ 27; *First Amended Complaint and Demand for Jury Trial*, Dkt. 15, at 7, ¶ 20; *Plaintiffs' Second Amended Complaint and Demand for Jury Trial*, Dkt. 21-1, at 7, ¶ 22; *Plaintiff's Revised Second Amended Complaint and Demand for Jury Trial*, Dkt. 28-2, at 7, ¶ 22.

[31] *Id.*, Dkt. 1, at 9, ¶¶ 27—29.

[32] Gouwens Aff. ¶ 6 ("The pharmacy allegations *clearly and unmistakably* describe several related, very complex Medicaid legal issues about which the firm was first consulted by ANTHC in 2013. Ms. Wilson worked extensively on those issues while she was working as a lawyer at the firm, and to a minor extent after she became ANTHC's Chief Ethics and Compliance Officer") (emphasis added) and *id*. ¶ 16 ("To the best of my knowledge, informed by consultations with the firm's

Sonosky firm and then while employed by ANTHC, Wilson worked extensively upon, and advised ANTHC about, the pharmacy matter she brought on behalf of the United States in her *qui tam* complaint.[33] The pharmacy matter alone sought a potential $160 million or more in damages, treble damages and civil fines for the Government, which in theory could have resulted in a personal *qui tam* reward to Wilson of more than $50 million.[34]

      **a.**    **Background on the related matter**.   To understand the pharmacy matter requires some understanding of how ANTHC bills for medical care and pharmaceuticals. ANTHC co-manages the Alaska Native Medical Center (ANMC) in Anchorage.[35] ANMC's services include very high cost, specialized medical services such as neurosurgery, orthopedic surgery, high risk pregnancy care, endocrinology, rheumatology, cardiology, and, relevant to pharmacy billing, oncology—i.e., cancer treatment and care.[36]

---

[33] Dkt. 1, at 9, ¶¶ 27—29.

partners, ANTHC never consented to Ms. Wilson's disclosure of the pharmacy allegations in the three complaints filed in this matter."); *accord*, Heslep Aff., ¶¶ 7 – 11.

[34] The FCA requires a relator to serve "copy of the complaint and written disclosure of substantially all material evidence and information the person possesses" upon the Government. 31 U.S.C. § 3730(b)(2). The Government has the right "to intervene and proceed with the action." *Id*. If the Government declines to intervene and proceed, the relator "shall have the right to conduct the action" *qui tam*, *i.e.*, on behalf of the Government. 31 U.S.C. § 3730(c)(3). If the relator prevails, they are entitled to receive a reward of "not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement." 31 U.S.C. § 3730(d)(2). ANTHC strongly disputes Wilson's pharmacy matter claim, along with the other meritless claims in Wilson's complaint.

[35] *See* "Indian Health Service: Alaska Area," https://www.ihs.gov/alaska/ (last visited Sept. 17, 2018) (The Alaska Tribal Health System "is a comprehensive system of health care that serves all 228 federally recognized tribes in Alaska. [Indian Health Service]-funded, tribally-managed hospitals are located in Anchorage, Barrow, Bethel, Dillingham, Kotzebue, Nome and Sitka. There are 58 tribal health centers, 160 tribal community health aide clinics and five residential substance abuse treatment centers. The Alaska Native Medical Center in Anchorage is the state-wide referral center and gatekeeper for specialty care.").

[36] *See generally* "Alaska Native Medical Center: Services Directory," http://anmc.org/services/anmc-services-directory (last visited Sept. 17, 2018).

ANTHC is allowed by law to bill responsible third parties for medical care provided to its patients, including Medicaid and Medicare.[37]  Generally, Medicaid pays what is called the "tribal encounter rate" for every patient visit to ANMC, *i.e.*, one fixed payment per day per patient, regardless of the services provided and medications administered.[38]  In some instances, however, ANTHC is authorized to bill over and above the encounter rate for services and medications.

ANTHC's cost to purchase specialty medications, particularly oncology infusion medications, is extremely high.[39]  The legal question in the pharmacy matter was whether ANTHC was entitled to bill Medicaid *both* the encounter rate for a cancer patient's visit *and* an additional charge for the costly drugs administered to the patient during the visit.[40]  ANTHC had received conflicting advice from the State of Alaska's Medicaid program on this issue and, given the legal uncertainty and the significant amounts at issue, ANTHC's General Counsel requested that Wilson review this issue and provide ANTHC with legal advice.[41]

      **b.**    **Wilson's work on the related matter at the Sonosky firm**.  Wilson was first contacted by ANTHC's General Counsel about this "potential billing question" on April 11, 2013. She began substantive work on the pharmacy matter on May 10, 2013, when she charged ANTHC for two hours of legal work including "begin[ning] review of material concerning pharmaceutical

---

[37] *See* Indian Health Care Improvement Act § 206, 25 U.S.C. § 1621e (2010).  Tribal health providers are authorized by Section 206 to bill Medicaid, Medicare and any available private insurance for care provided to patients who have health care coverage.

[38] The encounter rate is set annually by the Indian Health Service using a formula based on costs incurred by IHS and tribal health providers.  The 2013 Alaska tribal outpatient encounter rate was $515.  Reimbursement Rates for Calendar Year 2013, 78 Fed. Reg. 22,890 (Apr. 17, 2013).

[39] *See generally* Gustafson Aff., Ex. A (draft Wilson memorandum excerpt).

[40] *Id.*, Exs. A and B; Gouwens Aff. ¶¶ 5 – 7.

[41] Gouwens Aff. ¶ 7; Heslep Aff. ¶ 4; ALASKA DEP'T OF HEALTH & SOC. SERVS., ALASKA MED. ASSISTANCE PROVIDER BILLING MANUALS, TRIBAL FACILITY SERVS., POLICIES, AND PROCEDURES (2012);

billing inquiry," legal research, and a telephonic client conference with ANTHC's Interim Compliance Officer.[42] In a subsequent email to her supervisor, Ms. Wilson stated:

> A week ago, [ANTHC's General Counsel] Nacole Heslep asked us to verify some advice ANTHC received from DHSS, Division of Health Care Services regarding Medicaid billing for pharmaceuticals that are injected or otherwise dispensed to patients during their outpatient visits (see below). DHSS advises ANTHC that the drugs should be billed as part of the medical claim All Inclusive Rate (AIR) and not out of the pharmacy, even if the drugs are very expensive, that is, in the thousands of dollars range.[43]

Wilson worked on this issue for ANTHC through at least July 2014,[44] including performing extensive legal research, participating in multiple client conferences, and preparing at least twelve drafts of a lengthy, detailed memorandum (twenty-three pages, sixty-five footnotes) addressed to ANTHC's General Counsel[45]:

> You have asked us to assist the Alaska Native Tribal Health Consortium (ANTHC) determine the proper method of Medicaid reimbursement for pharmaceuticals that are physically administered to patients during outpatient visits. At issue is whether pharmaceuticals whose acquisition costs substantially exceed the tribal encounter rate, such as chemotherapy infusion drugs and implants, must be reimbursed as part of the tribal encounter rate applicable to the outpatient visit or whether the drugs may instead be separately reimbursed under the Alaska Medical Assistance Program's coverage for prescription drugs.[46]

**c.      Wilson received confidential ANTHC information about the related matter.**

The pharmacy matter was a highly sensitive matter, involving large Medicaid billings and complicated legal issues—indeed, Wilson alleges "overpayments that total at least $50 million."

---

[42] Gustafson Aff. Ex. B.
[43] Gouwens Aff. ¶ 7.
[44] Gustafson Aff. Ex. B (Wilson time slips).
[45] Gustafson Aff. ¶ 3 and Ex. A.
[46] *Id*. Ex. A at 1 (*N.b.*, the Word version of Wilson's draft memorandum has an automatic date function. The actual date on which this draft was produced was July 2, 2014, not October 10, 2018). The complete draft memoranda are available for *in camera* inspection if the Court requests.

The information Wilson received about the pharmacy matter from ANTHC, on which she based her memorandum, was entirely confidential client information. [47]

      **d.    Wilson switched sides against ANTHC on the related matter**.  On August 29, 2016, roughly three months after her employment ended, Wilson sued ANTHC on behalf of the United States in this *qui tam* suit filed under seal.

      Wilson's very first allegations concern the pharmacy matter: "Facts Related to Improper Pharmacy Billing."[48]  Wilson alleged ANTHC had made "at least $50 million" in inappropriate charges related to the pharmacy matter in violation of the False Claims Act, and that "[b]y virtue of the above-referenced violations of the False Claims Act, the United States has suffered damages and is therefore entitled to treble damages under federal law, to be determined at trial, plus civil penalties for each violation."[49]  Assuming these allegations could be proven, which ANTHC denies, after trebling and fines Wilson's personal *qui tam* reward could have been between $40 million and $50 million from the pharmacy matter alone.[50]

---

[47] Dkt. 1 at 9 ¶ 29; Heslep Aff. ¶¶ 8 – 10; Gouwens Aff. ¶¶ 11 – 13.

[48] Dkt. 1 at 9.

[49] *Id*. at 19 ¶ 53; *see* 31 U.S.C. § 3730(d).

[50] Wilson's personal reward would have been calculated as follows. The damages alleged on the pharmacy matter were $50 million in base amount, which would be multiplied by three to $150 million, plus added civil fines of possibly $10 million at the current rate of between $10,957 and $21,916 per claim. *See* 31 U.S.C. § 3729(a)(1)(G) (trebled damages and fines). Wilson would then be entitled to 25% – 30% of the total recovery, or somewhere around $40 million depending on the amount of fines and the Court's determination of the reward. 31 U.S.C. § 3730(d)(2) (if *qui tam* relator prevails, the relator is entitled to receive a reward of "not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement"). Wilson's other Counts alleged more than $120 million in damages to the United States; her *qui tam* reward for those Counts, in theory, could have reached $100 million, after trebling and civil fines. *Id*

Material to the motion at bar, Wilson's allegations that ANTHC "bills . . . for infusion drugs dispensed during an outpatient visit"[51] and that "ANMC inappropriately bills for pharmaceuticals dispensed incident to an outpatient visit,"[52] precisely track her work for ANTHC as outside counsel:

| Wilson's ANTHC Memorandum | Wilson's *Qui Tam* Complaint |
|---|---|
| "You have asked us to assist the Alaska Native Tribal Health Consortium (ANTHC) determine the proper method of Medicaid reimbursement for pharmaceuticals that are physically administered to patients during outpatient visits. At issue is whether pharmaceuticals whose acquisition costs substantially exceed the tribal encounter rate, such as chemotherapy infusion drugs and implants, must be reimbursed as part of the tribal encounter rate applicable to the outpatient visit or whether the drugs may instead be separately reimbursed under the Alaska Medical Assistance Program's coverage for prescription drugs."[53] | "ANTHC is in violation of the Alaska Tribal Billing Manual for Medicaid Services, which prevents ANMC from billing for pharmaceuticals dispensed incident to an outpatient visit. Specifically, ANTHC bills through its Pharmacy Medicaid Enrollment Number for infusion drugs dispensed during an outpatient visit. In a form of double billing, ANTHC also includes the expense of these drugs in the cost reports used to calculate the IHS encounter rate for outpatient visits. …"[54] |

    **e.**    **Wilson violated ARPC 1.9(a).** For Rule 1.9(a) purposes, there is a "substantial relationship" between the prior and present representations if the prior representation likely resulted in the lawyer receiving confidential information relevant to the present matter from her former client.[55] The pharmacy matter is not just "substantially related" to Wilson's work as outside

---

[51] *E.g.*, Dkt. 1 at 9 ¶ 27; Gustafson Aff., Ex. A.
[52] *Id*. at 15 ¶ 44.
[53] Gustafson Aff., Ex. A.
[54] Dkt. 1, at 9, ¶¶ 27, 29; *id*. at 15 ¶ 44 ("…ANMC inappropriately bills for pharmaceuticals dispensed incident to an outpatient visit…").
[55] *Moore*, 351 P.3d at 1072.

counsel; it is "clearly and unmistakably" the same exact matter.[56]  There is not just a "possibility, or the appearance of possibility" that Wilson received confidential information relating to the pharmacy matter; there is certainty.  Wilson indisputably received confidential client information about the pharmacy matter, in a steady stream over the course of more than a year, while representing ANTHC.[57]  Wilson continued to provide legal advice to ANTHC on the pharmacy matter after she started work there.[58]

Wilson's work for ANTHC provided her "'playbook' information" on the pharmacy matter, including confidences that her client would not have revealed to her had it known Wilson would disclose the information to third parties or, worse yet, attempt to misconstrue the information for the financial benefit of a third party.[59]  By filing this action, Wilson switched sides, both by representing the United States and by seeking personal financial gain for herself and her co-plaintiff. In doing so, Wilson violated the ARPC 1.9(a) duty of loyalty.

---

[56] Gouwens Aff., ¶ 6 (emphasis added) ("The pharmacy allegations clearly and unmistakably describe several related, very complex Medicaid legal issues about which the firm was first consulted by ANTHC in 2013.  Ms. Wilson worked extensively on those issues while she was working as a lawyer at the firm, and to a minor extent after she became ANTHC's Chief Ethics and Compliance Officer in September 2014.").

[57] *See also In re Rossana*, 395 B.R. 697, 702 (Bankr. D. Nev. 2008).

[58] Gouwens Aff. ¶¶ 6, 11; Heslep Aff. ¶ 10 ("In fact, this is precisely the same pharmacy matter that Ms. Wilson worked on for a year while representing ANTHC as outside counsel and on which Ms. Wilson continued working after starting her employment at ANTHC.").

[59] *Chugach Elec.. supra.,*370 F.2d at 442-43; *In re N. Am. Deed Co.*, 334 B.R. 443, 454-55 (Bankr. D. Nev. 2005) (citing RONALD D. ROTUNDA & JOHN S. DZIENKOWSKI, LEGAL ETHICS—THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY § 1.9-1(b)(3) (2005); GEOFFREY C. HAZARD & W. WILLIAM HODES, THE LAW OF LAWYERING § 14.12 (3d ed. 2005))*; Reading Intern., Inc. v. Malulani Grp., Ltd.*, 814 F.3d 1046, 1050-51 (9th Cir. 2016).

### 3. Wilson represented ANTHC on substantially related matters as an employed lawyer.

What is more, while employed at ANTHC Wilson learned about all other matters alleged in her *qui tam* action. Wilson alleges that she and her co-relator "are the original sources of the information outlined in this Complaint,"[60] that she personally "has intimate knowledge of the day-to-day operations and ANTHC's compliance with its own policies, and state and federal laws,"[61] that "[d]uring [her] tenure at ANTHC, [she] observed the day-to-day operations of ANMC, as well as the business practices of ANTHC,"[62] that "[t]he allegations herein are based on [her] personal observations,"[63] and that she "discovered,"[64] "investigated,"[65] and "learned [about]"[66] the many claims alleged in her complaint while employed at ANTHC. Even as to the pharmacy matter, Wilson alleges that while employed at ANTHC she "was personally aware of these practices and repeatedly attempted to reverse these practices."[67]

Despite this, defendant expects that Wilson will argue that she owed no ARPC 1.9(a) duty of loyalty from this period because her title at ANTHC was Chief Ethics and Compliance Officer, not "lawyer." She would be wrong.

**a. Wilson's job title is not material to the question.** "Whether a client-lawyer relationship exists for any specific purpose can depend on the circumstances and may be a question of fact."[68]

---

[60] Dkt. 1 at 3 ¶ 5.
[61] *Id.* ¶ 6.
[62] *Id.* at 8 ¶ 26.
[63] *Id.*
[64] *Id.* at 10 ¶ 32.
[65] *Id.* at 15 ¶ 45.
[66] *Id.* at 16 ¶ 46.
[67] *Id*. at ¶ 28.
[68] APRC Preamble, Alaska Rules of Court, *supra*..

The Alaska Supreme Court has not specified which circumstances courts should look at when determining whether a client-lawyer relationship existed. Courts in other jurisdictions hold that "[a]n attorney-client relationship is formed when an attorney renders advice directly to a client who has consulted him seeking legal counsel."[69] In those jurisdictions, "an attorney-client relationship may exist even when an attorney did not intend one to exist or had explicitly disclaimed any attorney-client relationship."[70]

   **b. Wilson admits practicing law at ANTHC.** Wilson applied for several State of Alaska judgeships on August 22, 2016, a few months after her termination at ANTHC and just a few days before she filed the *qui tam* complaint in this matter.[71] Alaska law requires that a lawyer "have been engaged for not less than five years immediately preceding appointment in the active practice of law" to qualify for the Superior Court, and "not less than eight years immediately preceding appointment" to qualify for the Court of Appeals.[72]

   Wilson attested to the Alaska Judicial Council that she had "been engaged in the active practice of law immediately preceding the date of this application" for a total of "19 years and 10 months."[73] In the application section titled "Legal Experience," where the applicant is required to

---

[69] *Waggoner v. Snow, Becker, Kroll, Klaris & Krauss*, 991 F.2d 1501, 1505 (9th Cir. 1993) (identifying standard employed under New York and California law). *See also State v. Longo*, 789 S.W.2d 812, 815 (Mo. App. 1990) (holding that a client-lawyer relationship "is sufficiently established when the advice and assistance of [the] attorney is sought and received in matters pertinent to her profession."); *In re Adoption of Irons*, 684 P.2d 332 (Kan. 1984) (same).

[70] *Matter of Hodge*, 407 P.3d 613, 648 (Kan. 2017) (citing *In re Adoption of Irons*, 684 P.2d at 332).

[71] Ex. A, "Alaska Judicial Council Application for Judicial Appointment."

[72] AS 22.10.090 ("Qualifications of Judges") (Superior Court); AS 22.07.040 ("Qualifications of Judges") (Court of Appeals); AS 22.05.070 ("The active practice of law includes … (2) being actually engaged in advising and representing clients in matters of law; (3) rendering legal services to an agency, branch or department of a civil government within the United States….").

[73] Ex. A at 1 (Wilson's application for Superior Court and Court of Appeals positions).

"[d]escribe chronologically your legal employment since admission to law school," Wilson listed

the "Alaska Native Tribal Health Consortium" as legal employment, and described her legal work

as "Chief Ethics and Compliance Officer responsible for ANTHC compliance with all applicable

law."[74] She elaborated in her "Additional Comments":

> I am one of the few candidates who at the advise [sic] of the Alaska Judicial [sic] has [sic] worked diligently and purposefully to diversify her practice with the eventual goal of reaching the bench. Over my twenty years as an attorney, I have worked in public and private practice. *I have served inhouse as a chief ethics and compliance officer*. I have appeared before the district, superior, appellate, federal district [sic], and Office of Administrative Hearings.[75]

    **c. Wilson's misappropriated documents confirm she practiced law at ANTHC**.

Review of the confidential documents that Wilson took when she was terminated shows that she

was, in fact, engaged in the practice of law at ANTHC, regardless of her job title. ANTHC

employees routinely requested legal advice and submitted confidential information to Wilson, and

Wilson freely rendered legal advice to ANTHC's officers and employees without reservation, in an

on-going and continual manner. The documents Wilson disclosed to the Department of Justice,

for example, contain at least 435 pages of Wilson's work that "could be characterized as having

attorney-client privileged information or falling within the attorney work product rule. These

include emails and other documents."[76] ANTHC's privileged/confidential document log, filed with

this motion, describes representative examples of Wilson's legal advice and lawyerly

communications in those documents.[77]

---

[74] *Id.*, at 4.
[75] *Id.*, at 14 (emphasis added).
[76] Affidavit of Martina Ruhle (Ruhle Aff.) ¶ 5b.
[77] Ex. B, ANTHC Privileged/Confidential Document Log (Examples).

In sum, Wilson was licensed and engaged in the active practice of law during her entire tenure at ANTHC. Providing legal counsel was a key part of Wilson's job responsibilities, as further evidenced by ANTHC's payment of Wilson's Bar Association dues and continuing legal education fees while she was employed.[78] Wilson gave legal advice freely during her employment. Indeed, Wilson went out of her way to make it known that she was a lawyer for ANTHC during her tenure there.[79] And, of course, Wilson represented to the Alaska Judicial Council that she was in the active practice of law during her entire tenure at ANTHC.

When Wilson sued ANTHC in this matter on behalf of the United States, raising claims that she allegedly "discovered,"[80] "investigated,"[81] and "learned [about]"[82] as a lawyer working for ANTHC, she switched sides and violated the ARPC 1.9(a) duty of loyalty—not just on the pharmacy matter, but on all issues she alleges in her complaint. And again, Wilson sought personal financial gain from having switched sides against her former client based solely on claims that she "learned [about]" while in the active practice of law as her former client's Chief Ethics and Compliance Officer.[83] Wilson's false claim and fraud allegations are without merit, as the Department of Justice's declination implies. Regardless of merit, it was ethically improper for Wilson to switch sides and sue her client on matters substantially related to her work as a lawyer for that same client.

---

[78] Heslep Aff. ¶¶ 11 – 14.
[79] *Id.*
[80] Dkt. 1, at 10 ¶ 32.
[81] *Id.* at 15 ¶ 45.
[82] *Id.* at 16 ¶ 46.
[83] *Id.* at 16 ¶ 46.

**B. Wilson violated ARPC 1.9(c) by using and disclosing ANTHC's confidences and secrets.**

In addition to violating the ARPC 1.9(a) duty of loyalty, Wilson violated ARPC 1.9(c) by using and disclosing client confidences and secrets both from her time at the Sonosky firm and at ANTHC. A lawyer's ethical obligations to her former client include not just loyalty, but also confidentiality.[84] The duty of confidentiality is articulated in ARPC 1.9(c), which provides:

> A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter: (1) use confidences and secrets to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or (2) reveal confidences and secrets except as these Rules would permit or require with respect to a client.

The duty of confidentiality is essential for the attorney-client relationship to function. As the Alaska Bar Ethics Committee has stated:

> The preservation of confidences and secrets of a client are essential to the attorney/client relationship and should be protected. Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him. A client must feel free to discuss whatever he wishes with his lawyer and the lawyer must be equally free to obtain information beyond that volunteered by his client. The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of his client not only facilitates the full development of facts essential to proper representation of the client, but also encourages laymen to seek early legal assistance.[85]

---

[84] *See, e.g., Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir. 1973) (explaining the need for "a strict prophylactic rule to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage").

[85] Alaska Bar Ass'n Ethics Comm., Ethics Op. 84-2 (1984).

After her employment was terminated, Wilson took two ANTHC laptops and with them at least 6,000 pages of confidential ANTHC documents and electronic data, which she then disclosed to the United States Department of Justice and the State of Alaska. [86] Wilson continued to disclose confidential client information to the public through the multiple iterations of the complaint in this matter (four versions, so far), all of which recite confidential ANTHC information as part of lengthy statements of background "facts."[87] Wilson did not have ANTHC's consent to disclose this confidential information nor to provide ANTHC's documents to any potentially adverse party—or to the public or any other third party, for that matter:

> While working at Sonosky Chambers, Ms. Wilson communicated about the pharmacy matter with me, with our Interim Compliance Officer, with our Chief Pharmacist and other ANTHC employees. We considered these communications to be confidential, part of the Ms. Wilson's representation of ANTHC, protected by the attorney client relationship and the attorney work product rule. ANTHC has never given Ms. Wilson its consent to discuss, disclose or publish any information or communications, documents or other information relating to the pharmacy matter or, for that matter, relating to any other issue in the complaint. The same is true of the information made available to Ms. Wilson when she continued working on the pharmacy matter, and a variety of other legal issues, at ANTHC. [88]

Even in those limited situations where revealing confidential information is permitted, such as in preventing the furtherance of fraud involving the lawyer's participation, revealing that information and accepting any monetary reward for doing so are regarded as two separate acts, with

---

[86] *See*, Gustafson Aff. Ex. C ("You are correct that our clients provided information to the Department of Justice ("DOJ") and to the State of Alaska. . . . Enclosed is a thumb drive that contains Bates numbered documents provided to the DOJ in the following categories: [lists seventeen categories of documents]." See 31 U.S.C. § 3730(b)(2).

[87] *See* Dkt. 1 at 9 ¶ 27; Dkt. 15 at 7 ¶ 20; Dkt. 21-1 at 7 ¶ 22; Dkt. 28-2 at 7 ¶ 22. *N.b.*, ANTHC does not concede any allegation whatsoever and strongly disputes that plaintiffs' allegations are accurate, correct, complete, or state any valid claim against it.

[88] Heslep Aff., ¶ 9; *accord* Gouwens Aff., ¶ 13.

the acceptance of any reward regarded as ethically unjustifiable.[89] A lawyer is only permitted to reveal "reasonably necessary" information: seeking a bounty for disclosing that information, such as Wilson sought in her *qui tam* complaint, creates the presumption that that lawyer's judgment as to what was "reasonably necessary" was influenced by the prospect of a monetary reward.[90] And, a lawyer is not permitted to do directly as a party what they otherwise would not be permitted to do indirectly in a representative capacity.[91] By these disclosures, Wilson violated her ARPC 1.9(c) duty of confidentiality.[92]

---

[89] NYCLA Comm. on Prof'l Ethics, Formal Op. 746 (2013) (Topic: Ethical Conflicts Caused by Lawyers as Whistleblowers Under the Dodd-Frank Wall Street Reform Act of 2010); John G. Dumnich, *Going Rogue: Attorney-Relators*, 40 SETON HALL LEGIS. J. 467, 495 (2016).

[90] NYCLA Comm. on Prof'l Ethics, Formal Op. 746, *supra*.; see ARPC 1.6(b).

[91] Kathleen Clark and Nancy J. Moore, *Financial Rewards for Whistleblowing Lawyers*, 56 B.C. L. REV. 1697, 1737 (Nov. 2015); ARPC 1.6(b). Wilson may seek to justify her sweeping breaches of client confidentiality by reference to ARPC 1.6(b), which permits a lawyer to reveal client confidences "to the extent the lawyer reasonably believes necessary" in certain enumerated circumstances. ARPC 1.6(b) does not have an exception permitting the lawyer to seek profit from disclosing client confidences and, "[i]n any case, a disclosure adverse to the client's interest should be no greater than the lawyer reasonably believes necessary to accomplish the purpose. If the disclosure will be made in connection with a judicial proceeding, the lawyer should ask the tribunal to limit access to the information to the tribunal or other persons having a need to know it and appropriate protective orders or other arrangements should be sought by the lawyer to the fullest extent practicable." *Id.*, at 923 cmt. Wilson disclosed far more than was necessary and she made no such efforts to "limit access" to ANTHC's confidential information in this matter. *See Spratley v. State Farm Mut. Auto. Ins. Co.*, 78 P.3d 603, 610 (Utah 2003) ("[A]ny disclosures made by the attorney that are not reasonably necessary to the claim may still subject that attorney to professional discipline or litigation sanctions; a trial court's failure to prevent improper disclosure will not be a safe harbor for former in-house counsel who carelessly disclose more than is reasonably necessary to the claim.").

[92] ARPC 1.9(c)(1). *See also* Restatement (Third) of the Law Governing Lawyers § 60 cmt. (c)(i) (2000) ("Both use and disclosure adverse to a client are prohibited. As the term is employed in the Section, use of information includes taking the information significantly into account in framing a course of action, such as in making decisions when representing another client or in deciding whether to make a personal investment.").

## C. Wilson's misappropriation abused the judicial process.

Setting aside Wilson's multiple violations of the Alaska Rules of Professional Conduct, this Court has the independent, inherent authority to dismiss this action because of Wilson's misappropriation of the two ANTHC laptops, the confidential records contained on the laptops, and other confidential documents.[93] "[A] court may exercise its inherent powers to sanction bad-faith conduct that abuses the judicial process, including pre-litigation acts that directly affect a lawsuit."[94] "Dismissal is an available sanction when 'a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings' because courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."[95] In order to impose the sanction of dismissal, a district court must find "'willfulness, fault, or bad faith'" and the court must consider the availability of lesser sanctions.[96]

The Ninth, Tenth, and Eleventh Circuits have affirmed terminating sanctions based on bad faith prelitigation conduct that affected the court proceedings.[97] To establish bad faith in this context, it is not necessary to show that the improperly-obtained records are confidential or

---

[93] Gustafson Aff., Ex. C.

[94] *Xyngular v. Schenkel ("Xyngular II")*, 890 F.3d 868, 873 (10th Cir. 2018).

[95] *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (citation and internal quotation marks omitted).

[96] *Id.* (quoting *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995)); *Xyngular v. Schenkel ("Xyngular I")*, 200 F.Supp.3d. 1273, 1301 (D. Utah 2016) ("Conduct amounts to 'bad faith' if it shows '"intentional or reckless disregard" of the rules.'" (quoting *Rhodes v. LaSalle Bank, N.A.*, No. 02 C 2059, 2005 WL 281221, at *2 (N.D. Ill. Feb. 1, 2005), *aff'd*, 890 F.3d at 868).

[97] *Jackson v. Microsoft Corp.*, 78 F. App'x 588, 589 (9th Cir. 2003); *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306-07 (11th Cir. 2009) (affirming dismissal sanction where party was in possession of "confidential and privileged emails" because that made adjudication of his claims untenable); *Xyngular II*, 890 F.3d at 874-75.

privileged; it is sufficient that the party "abused the judicial process in collecting them."[98] Lesser sanctions are inappropriate when a party circumvents the discovery process by stealing documents prior to litigation, because "any sanction short of dismissal would incentivize future litigants to similarly misappropriate documents in anticipation of litigation."[99]

A party's misappropriation of her opponent's documents threatens the integrity of a judicial proceeding and subverts the due administration of justice. The discovery process outlined in the Rules of Civil Procedure exist to balance one party's need for relevant documents and information with the competing needs of maintaining order, preserving privileges, and preventing harm to litigants and third parties. "The protections and remedies found in the Rules provide the means to a structured and fair exchange of information."[100] Only where parties follow the Rules when obtaining their opponent's documents does a court provide "a process that litigants can trust to protect their sensitive information and to prevent abusive conduct."[101]

*Xyngular Corp. v. Schenkel* is particularly on point. In *Xyngular*, defendant Schenkel allegedly suspected that Xyngular was "engaging in illegal and otherwise unethical conduct," so prior to litigation against the company, he surreptitiously obtained documents concerning the alleged illegal conduct and his alleged partial-ownership of the company.[102] After Schenkel filed suit, Xyngular moved for terminating sanctions, arguing that Schenkel "engaged in bad faith

---

[98] *Xyngular II*, 890 F.3d at 875.
[99] *Id. See also Eagle Hosp. Physicians*, 561 F.3d at 1306 (upholding district court's finding that lesser sanction would be inadequate because "permitting this case to continue would be an open invitation to others to abuse the judicial process."); *Jackson*, 78 F. App'x at 589 (holding that lesser sanctions would be inadequate where party "had received and reviewed privileged information" because the opposing party "would be unfairly prejudiced were the case to go forward.").
[100] *Xyngular I*, 200 F. Supp. at 1321.
[101] *Id.*
[102] *Id.* at 1284-85.

misconduct when he requested information and documentation from [inside the company], reviewed documents on [a] laptop, collected copies of those documents, and then used those documents in this case." The court found that Schenkel had engaged in bad faith because he had "collected over three hundred documents" without authorization, some of which were privileged and confidential, and then used those documents in "litigation to support his claims."[103] It is bad faith, the court held, "'to secretly obtain non-public internal business documents from an opposing party.'"[104]

Schenkel attempted to argue, as Wilson may attempt here, that "far from acting improperly, he gathered documents as a whistleblower with the intent to report illegal conduct to government authorities."[105] The court was unpersuaded, holding that "Schenkel's collection of over three hundred documents—many of which contain sensitive business and personal information—was improper for a whistleblower, let alone for a potential litigant. His whistleblower activity, if any, does not shield his bad faith conduct."[106] In issuing terminating sanctions, the district court explained why this sort of prelitigation conduct cannot be allowed in federal court:

> Parties anticipating litigation may not engage in self-help by improperly gathering a potential adversary's property. This conduct is an affront to the established rules of engagement and fair play in lawsuits. It amounts to an end-run around the Federal Rules of Civil Procedure, including the rules governing discovery and the orderly exchange of information relevant to disputes presented for resolution in our courts. This conduct undermines the confidence of both litigants and the public in the fairness of judicial proceedings. Schenkel's actions demonstrate willfulness, bad faith, and fault

---

[103] *Id.* at 1312-14.
[104] *Id.* at 1316 (quoting *Glynn v. EDO Corp.*, No. JFM-07-01660, 2010 WL 3294347, at *5 (D. Md. Aug. 20, 2010)).
[105] *Id.* at 1318.
[106] *Id.* at 1319.

that abuses the judicial process and impugns the integrity of these proceedings. Serious sanctions are warranted.[107]

Wilson's prelitigation conduct in this matter is much worse than Schenkel's. Wilson misappropriated two ANTHC laptops containing not just 300 records, but over 6,000 pages of highly confidential and legally protected records, including attorney-client privileged documents and protected patient health information, which she used to bring this litigation. As Wilson's counsel admitted, one of the computers that Wilson misappropriated:

> contains information that is relevant to all of the claims. For example, Ms. Wilson's computer contains files from MediRegs (the ANTHC compliance software), and emails to and from Roald Helgesen, in which Ms. Wilson discussed compliance and regulatory issues. Ms. Wilson maintained some of the non-privileged documents that supported her retaliation and wrongful termination claims, and also retained some documentation that supports the other claims in the Complaint.[108]

ANTHC still does not know the full extent of Wilson's misappropriation. From the Bates number sequencing, it appears there are at least 824 pages of additional misappropriated records that were not included in the thumb drive that Wilson turned over to ANTHC.[109]

The result in this case should be no different from the result in *Xyngular*. Wilson's bad faith is evidenced by her contempt of the law and the judicial process in collecting these records. Because her conduct has impugned the integrity of these proceedings, no lesser sanction than dismissal would be adequate.

---

[107] *Id*. at 1317.
[108] Gustafson Aff., Ex. C.
[109] Ruhle Aff. at ¶ 4.

## IV.     CONCLUSION: Wilson, Franke and Dillon & Findley must be disqualified.

The remedy for a lawyer's breaches of the duties of loyalty and confidentiality is dismissal and disqualification.  According to the Alaska Supreme Court, disqualification is appropriate where counsel's continued participation "'taints the legal system or the trial of the cause before it.'"[110] Under Alaska law, courts "'have an independent interest in ensuring that . . . trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'"[111]   The district court has discretion to disqualify a lawyer who violates the applicable State professional conduct rules "as a function of its responsibility for controlling the conduct of lawyers" before it.[112]

A lawyer and her client "are in a fiduciary relationship of the very highest character," and "[t]he duties of confidentiality and loyalty are owed to *former* as well as *present* clients."[113] Disqualification is viewed as a "'drastic measure . . . and should only be imposed when absolutely necessary'"; however, "few should want a world in which no disqualification exists [as] it would effectively permit instances of very bad conduct to continue through the close of the case."[114] "[T]he paramount concern must be the preservation of the public trust both in the scrupulous administration

---

[110] *Eufemio v. Kodiak Island Hosp.*, 837 P.2d 95, 104 n.17 (Alaska 1992) (quoting *Borman v. Borman*, 393 N.E.2d 847, 855 (Mass. 1979)).

[111] *Daniels v. State*, 17 P.3d 75, 82 (Alaska Ct. App. 2001) (quoting *United States v. Locascio*, 6 F.3d 924, 931 (2nd Cir. 1993)).

[112] *Quatama Park Townhomes Owners Ass'n v. RBC Real Estate Fin., Inc.*, No. 3:18-cv-00023-SB, 2018 WL 3689902, at *4 (D. Or. Aug. 3, 2018) (citing *Gas-A-Tron of Az. v. Union Oil Co.*, 534 F.2d 1322, 1325 (9th Cir. 1976) (noting that a district court may use its discretion to disqualify an attorney if there is a sound basis for doing so)).

[113] *Bury*, 2002 WL 968833, at *4 (disqualifying attorney/relator for breaches of the duties of confidentiality and loyalty).

[114] Keith Swisher, *The Practice and Theory of Lawyer Disqualification*, 27 GEO J. LEGAL ETHICS 71, 110 (2014).

of justice and in the integrity of the bar.'"[115] The duty of loyalty to a former client is so strong that representation of a subsequent client with substantially related adverse interests to the prior client is presumed to violate the duty, irrespective of the specific information actually revealed by the lawyer concerning the former client.[116]

The integrity of the judicial system is particularly at risk where, as here, a lawyer brings an action against a former client and the complaint relies on "facts the attorney learned in confidence, . . . with regard to which no exception or waiver applies."[117] "The attorney cannot be allowed to pursue the client to the client's detriment, using as a sword information obtained from the client in confidence."[118] This is such a strong presumption that "even without a clear violation of a specific ethical rule, many courts will disqualify the lawyer if the lawyer's conduct creates a strong appearance of impropriety."[119] The interests of the client are always of primary concern, with the interests of the lawyer coming second.[120]

As noted earlier, the Alaska Supreme Court has ¨held that 'an attorney "may not represent a third party against a former client where there exists a substantial possibility that knowledge gained by him in the earlier professional relationship can be used against the former client, or where the subject matter of his present undertaking has a substantial relationship to that of the prior

---

[115] *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 105 F.Supp.3d 1100, 1108-09 (E.D. Cal. 2015) (quoting *Concat LP v. Unilever, PLC*, 350 F.Supp.2d 796, 814 (N.D. Cal. 2004)). *See also State Farm Mut. Auto. Ins. Co. v. Fed. Ins. Co.*, 86 Cal. Rptr. 2d 20, 24 (Cal. Ct. App. 1999).
[116] *Trone*, 621 F.2d at 1001.
[117] *In re Rindlisbacher*, 225 B.R. 180, 184 (B.A.P. 9th Cir. 1998).
[118] *Id.*
[119] Swisher, *supra*, at 94.
[120] *Qwest Corp. v. Anovian, Inc.*, No. Co8-1715RSM, 2010 WL 1440765, at *6 (W.D. Wash. Apr. 8, 2010) (quoting *Oxford Systems, Inc. v. CellPro, Inc.*, 45 F.Supp.2d 1055, 1066 (W.D. Wash. 1999)).

Case 3:16-cv-00195-TMB   Document 33   Filed 10/12/18   Page 30 of 32

representation.'"[121]   In *Quest*, the Second Circuit held "that the District Court did not err by dismissing the complaint as to all defendants, and disqualifying plaintiff, its individual relators, and its outside counsel on the basis that such measures were necessary to avoid prejudicing defendants in any subsequent litigation on these facts."[122]

Wilson's use and disclosure of confidential and misappropriated information to her counsel, to her co-plaintiff Franke, to the State of Alaska, to the Department of Justice, and to the public from which a jury would be assembled to eventually decide this case, is improper and prejudicial to defendant ANTHC and irreparably taints this litigation.   Wilson's conduct is "rock-solid ground"[123] for dismissal of this action and the concomitant disqualification of plaintiffs Joan Wilson, Paul Franke, and their counsel.[124]

---

[121] *Moore*, 351 P.3d at 1072 (*quoting Griffith*, 937 P.2d at 301).

[122] *Quest Diagnostics, Inc.*, 734 F.3d at 158.

[123] Swisher, *supra*, at 113.

[124] Regarding Dillon & Findley, PC, *see* ARPC 8.4(a) (AK. BAR ASS'N 2017) ("It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another"); *id*. § 1.16(a) ("[A] lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if: (1) the representation will result in violation of the rules of professional conduct or other law"); *Richards v. Jain*, 168 F. Supp.2d 1195, 1203 (W.D. Wash. 2001) (requiring disqualification of attorneys that wrongly reviewed improperly attained privileged materials, on the basis that attorneys "cannot turn a blind eye to the obvious to avoid their ethical duties."); *U.S. ex rel Hartpence v. Kinetic Concepts, Inc.*, Nos. CV 08–1885–GHK (AGRx), CV 08–6403–GHK (AGRx), 2013 WL 2278122 at *3 (C.D. Cal. May 20, 2013) ("Relators' counsel should have known that many of the documents Relators took from KCI [their former-employer], which included communications with KCI's attorneys, were privileged, and they should have sought guidance from the Court even before transferring such documents to the USAO.  . . . . Relators' counsel therefore failed to comply with their affirmative duty to take 'reasonable remedial action' after they received privileged documents, and we conclude that disqualification is appropriate.").

Case 3:16-cv-00195-TMB   Document 33   Filed 10/12/18   Page 31 of 32

DATED this 12th day of October 2018, at Juneau, Alaska.

SONOSKY, CHAMBERS, SACHSE,
MILLER & MONKMAN, LLP

*/s/ Richard D. Monkman*

By:_____

Richard D. Monkman,
Alaska Bar No. 811101
rdm@sonosky.net
302 Gold Street, Suite 201
Juneau, Alaska 99801
Telephone: 907.586.5880
Facsimile: 907.586.5883

ALASKA NATIVE TRIBAL HEALTH
CONSORTIUM

Robert P. Lynch,
Alaska Bar No. 1305020
rplynch@anthc.org
Senior Legal Counsel
Alaska Native Tribe Health Consortium
4000 Ambassador Drive,
Anchorage, Alaska 99503
Telephone: 907.729.8218
Fax: 907.729.2005

Counsel for Alaska Native Tribal Health
Consortium

**Certificate of Service**

I certify that on October 12, 2018, a copy of the
foregoing document was served via ECF on:

Margaret Simonian, meg@dillonfindley.com
Molly C. Brown, molly@dillonfindley.com
Nicholas C. Perros, nicholas.c.perros@usdoj.gov
Richard L. Pomeroy, richard.pomeroy@usdoj.gov

*/s/ Richard D. Monkman*

By:_____

Richard D. Monkman